# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ST. PAUL FIRE AND MARINE INSURANCE          CIVIL ACTION
COMPANY, ET AL.

VERSUS                                              No.  07-3053

BOARD OF COMMISSIONERS OF THE PORT          SECTION:  I/5
OF NEW ORLEANS

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by plaintiffs, St. Paul Fire and Marine Insurance Company, Insurance Company of North America and American Home Assurance Company (collectively "the Underwriters"). For the following reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.[1]

## BACKGROUND

This action for declaratory judgment arises in connection with a state court judgment awarding John Morella ("Morella") and his wife damages for injuries sustained in a July, 2001 accident on property owned by defendant, the Board of Commissioners of the Port of New Orleans ("the Board"). In 2002, Morella filed a lawsuit against the Board in state court alleging that he was driving a top loader when his vehicle fell into a pothole, causing

---

[1]In a telephone conference with the Court, the parties confirmed that they had no objections to the admissibility of any evidence submitted in connection with this motion. Rec. Doc. No. 64.

him injuries.[2] The state court tried the case without a jury on January 16, 2007, and on February 28, 2007, the state court entered a $2.6 million judgment in favor of Morella and a $50,000 judgment in favor of his wife on her loss of consortium claim.[3] Following a motion for new trial, the state court entered an amended judgment on March 23, 2007, awarding interest at a rate of six percent from the date of judicial demand.[4] The Louisiana Fourth Circuit Court of Appeals affirmed the judgment on May 14, 2008.[5] *Morella v. Bd of Comm'rs of Port of New Orleans*, 988 So. 2d 266 (La. Ct. App. 4th Cir. 2008).

At the time of Morella's injuries, the Underwriters had issued the Board an excess insurance policy, known as a "Bumbershoot" policy, which provided coverage above the $1 million limits of the Board's underlying policies. The policy was in effect from June 14, 2001 to June 14, 2002.[6]

On May 30, 2007, the Underwriters filed this lawsuit, seeking a declaratory judgment that the policy does not cover the Board's

---

[2]Rec. Doc. No. 34-5. Morella was employed by New Orleans Marine Contractors, which subsequently merged into P&O Ports of Louisiana ("P&O"). However, his petition alleges that the Board owned and maintained the Frances Road Terminal Yard where he was driving the top loader. The Board leased the premises to P&O.

[3]Rec. Doc. No. 34-2, p. 2; Rec. Doc. No. 48, p. 3; Rec. Doc. No. 49, p. 6.

[4]Rec. Doc. No. 34-12. Morella's employer was awarded $413,033.90, such amount to be deducted from the $2.6 million awarded to Morello.

[5]The Fourth Circuit amended the judgment to, among other things, allocate 25 percent of the fault to P&O.

[6]Rec. Doc. No. 34-3, para. 27; Rec. Doc. No. 34-14.

liability for Morella's injuries because the Board failed to timely notify the Underwriters of Morella's claim as required by the policy. The Board filed a third-party complaint against its insurance brokers, Aon Corporation, Aon Risk Services, Inc. of Texas and Aon Risk Services, Inc. of Louisiana (collectively "Aon"). The Board alleges that Aon assumed the duty of notifying the Board's insurers of claims against the Board which may involve the Board's insurance policies.[7]

On May 29, 2009, the Underwriters filed this motion for summary judgment, arguing that it is entitled to a declaratory judgment that the Board is not entitled to coverage based on a policy provision requiring that the insured send notice "as soon as practicable" whenever it "may reasonably conclude that an occurrence covered [under the policy] involves an event likely to involve [the] Policy."[8] The Underwriters claim that they did not receive notice of Morella's claim until after the judgment had been entered and then amended.[9]

The Board does not claim that the Underwriters were put on notice before the amended judgment was issued, asserting only that it notified Aon and that the Board "is unaware of when Aon

_____

[7] Rec. Doc. No. 7, para. VII.

[8] Rec. Doc. No. 34-2, p. 6; Rec. Doc. No. 34-14, p. 10.

[9] Rec. Doc. No. 58, p. 2. The Underwriters claim that they received notice on March 28, 2007, "concurrent with the filing of the appeal."

provided notice to Excess Insurers."[10]  Aon contends that it notified the Underwriters of the amended judgment on or about March 23, 2007.[11] Aon further argues that it submitted loss summaries to the Insurance Company of North America when it submitted policy renewal applications in 2003, 2004 and 2005 and that these summaries identified Morella's claim.

**LAW AND ANALYSIS**

## I. STANDARD OF LAW

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 266, 274 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

---

[10]Rec. Doc. No. 49-7, pp. 2, 4, 5.

[11]Rec. Doc. No. 48, p.3

4

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211-12 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255, 106 S. Ct. at 2513, 91 L. Ed. 2d at 216; *see Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52, 143 L. Ed. 2d 731, 741 (1999).

## II. <u>CHOICE OF LAW</u>

The Board's bumbershoot policy provides that it "shall be governed by the internal laws of the State of New York in all

respects, including matters of interpretation and performance..."[12]
Given the choice-of-law clause, the Underwriters contend that New
York law governs this dispute. On the other hand, the Board and Aon
contend that Louisiana law applies because Louisiana has a more
significant interest than New York and because application of New
York law is contrary to Louisiana policies.

In order to apply the appropriate choice-of-law rules, the
Court must first determine whether it has admiralty jurisdiction or
whether its jurisdiction is based solely upon the parties' diversity
of citizenship. Within the Fifth Circuit, "it is well-settled that
a marine insurance policy is a maritime contract within federal
admiralty jurisdiction." *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d
882, 886 n.2 (5th Cir. 1991). The parties, however, dispute whether
the insurance policy at issue is a marine insurance policy and,
therefore, a maritime contract giving rise to admiralty
jurisdiction.[13]

Notwithstanding Aon's and the Board's arguments, the Court must
look beyond the facts that Morella's accident occurred on land and
that the bumbershoot policy covered some non-marine risks. Indeed,
the United States Supreme Court has held that whether a contract is
maritime "'depends upon...the nature and character of the contract'
and the true criterion is whether it has 'reference to maritime

---

[12]Rec. Doc. No. 34-14, p. 16.

[13]The parties do not dispute that this Court has diversity jurisdiction.

6

service or maritime transactions'" rather than "whether a ship or vessel was involved" or where the work was performed. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23-24, 125 S. Ct. 385, 393, 160 L. Ed. 2d 283 (2004)(citations omitted); *see also Alleman v. Omni Energy Servs. Corp.*, 570 F.3d 680, 684 (5th Cir. 2009)("[M]aritime contract law applies based on the nature and character of the contract, rather than looking to where it occurred."). Given that the "fundamental interest giving rise to maritime jurisdiction is the protection of maritime *commerce*," the inquiry focuses on "whether the principal objective of a contract is maritime commerce." *Kirby*, 543 U.S. at 24 (internal quotations omitted). The Court's focus is no longer on "whether the non-maritime components are properly characterized as more than 'incidental' or 'merely incidental' to the contract." *Folksamerica Reinsurance. Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 315 (2d Cir. 2005)(citing *Kirby*, 543 U.S. at 25-26).

The United States Court of Appeals for the Second Circuit applied *Kirby* when wrestling with the issue of whether it lacked admiralty jurisdiction due to a comprehensive general liability ("CGL") section of a reinsurance policy. *Id*. In doing so, the court examined whether the policy assumed marine risks. *Id.* at 316 ("Whether an insurance policy is marine insurance depends on 'whether the insurer assumes risks which are marine risks.'" (quoting *Jeffcott v. Aetna Ins. Co.*, 129 F.2d 582, 585 (2d Cir. 1942))). The court noted that CGL policies generally cover

liabilities arising from bodily injuries and property damage and that the policy at issue excluded certain traditional marine risks, such as Protection and Indemnity ("P&I") risks and Collision and Tower's liability. *Id* at 317-18. The court found, however, that the policy did contain four aspects that it considered marine in nature, including pollution coverage, completed operations hazard coverage, products hazards coverage, and a portion of the policy's premises and operations coverage. *Id.* at 319-21 ("Pollution coverage is widely recognized as marine in nature."). Finding that the primary objective of the policy was to establish marine insurance and to cover maritime risks, the court determined that it had admiralty jurisdiction. *Id.* at 323.

At issue in this case is a "Global Marine" "Bumbershoot Liabilities" policy. A bumbershoot policy is generally known as "a marine 'umbrella cover,' which provides general liability coverage of a marine nature." Robert T. Lemmon, *Allocation of Marine Risks: An Overview of the Marine Insurance Package,* 81 TUL. L. REV. 1467, 1489 (June, 2007). This bumbershoot policy provides coverage for "[a]ll protection and indemnity risks of whatsoever nature including but not limited to, those covered by the underlying protection and indemnity insurances," "[g]eneral average, collision liabilities, towers liabilities, salvage, salvage charges, and sue and labor arising from any cause whatsoever," and "[a]ll other sums which the Assured shall become legally liable to pay...for damages of

whatsoever nature" for "personal injuries" and "property damage."[14] Such coverage is considered standard in marine bumbershoot policies. *Id.* Additionally, the bumbershoot policy is excess to underlying insurance policies that cover marine risks, such as P&I coverage, Jones Act coverage, and vessel pollution.[15]

"[C]overage determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the insurance contract and the nature of the business insured." *Folksamerica*, 413 F.3d at 317. Given the fact that the primary objective of the policy is maritime commerce, the Court has admiralty jurisdiction pursuant to 28 U.S.C. 1333(1) and the Court must apply admiralty choice-of-law rules.

"[U]nder admiralty law, where the parties have included a choice of law clause, that state's law will govern unless the state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law." *Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988); *see also In re BSI Drilling & Workover, Inc.*, No. 97-30624, 1998 WL 92464 (5th Cir. 1998). Given that one of the Underwriters, American Home Assurance Company ("AHAC"), is a New York corporation and has its principal place of business in New York, the Court cannot conclude that New York lacks a substantial

---

[14]Rec. Doc. No. 34-14, p. 5.

[15]*Id.* at p. 17.

relationship to the parties. *See Advanced Logistical Support, Inc.*
*v. Fritz Cos., Inc.*, No. 02-2979, 2003 WL 21459688, at *6 (E.D. La.
June 18, 2003)(Barbier, J.)(citing *Hale v. Co-Mar Offshore Corp.*,
588 F. Supp. 1212, 1215 (W.D. La. 1984)). Nor does New York law
conflict with the fundamental purpose of maritime law in light of
the parties agreement that state law, not maritime law, governs this
insurance dispute. *See Albany*, 927 F.2d at 886-87 ("[R]egulation of
marine insurance is, in most instances, properly left with the
states...This presumption of state law is, by now, 'axiomatic.'State
law, therefore, governs the interpretation of marine insurance
policies unless an available federal maritime rule controls the
disputed issue." (quoting *INA of Tex. V. Richard*, 800 F.2d 1379,
1380 (5th Cir. 1986))). Accordingly, the Court will apply New York
law.

## III. <u>NOTICE OF OCCURRENCE</u>

Under New York law, a "notice-of-occurrence" provision in an
insurance policy is a condition precedent to an insurer's liability
under the policy. *Comm. Union Ins. Co. v. Int'l Flavors &*
*Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir. 1987); *U.S.*
*Underwriter's Ins. Co. v. Ziering*, No. 06-1130, 2009 WL 238562, at
*5 (E.D.N.Y. Feb. 2, 2009). New York law applicable to the policy at
issue states that the "insured's failure to comply with a notice-of-
occurrence provision is generally a complete defense even if the
insurer was not prejudiced by the untimely notification." *Olin Corp.*
*v. Ins. Co. of N. America*, 966 F.2d 718, 723 (2d Cir. 1992)(citing

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 121 (2d Cir. 1987)); *AXA Marine & Aviation Ins. v. Seajet Indus., Inc.*, 84 F.3d 622, 624-25 (2d Cir. 1996); *Kaesong Corp. v. United Nat'l Specialty Ins. Co.*, No. 07-2897, 2008 WL 1902684 (E.D.N.Y. Apr. 25, 2008)("Late notice is a complete defense to liability whether or not the insurance company was prejudiced by the delay.").[16] Finding that excess insurers have "'the same vital interest in prompt notice as do primary insurers," New York courts have extended the application of the no prejudice rule to excess insurers. *Olin Corp v. Am. Re-Insurance Co.*, 74 Fed. App'x 105, 108 (2d Cir. 2003).

The duty to provide notice "does not begin on the basis of mere speculation, rumor, or remote contingencies far removed from the particular policy in question." *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 275 (2d Cir.1992). Instead, the standard is one of reasonableness, requiring courts to objectively evaluate the facts known to the insured. *Id.* "The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Comm. Union*, 822 F.2d at 272.

Notwithstanding, New York courts recognize certain

---

[16]The New York Legislature recently amended the law, stating that a failure to give timely notice does not invalidate a claim unless the insurer was prejudiced by the late notice. N.Y. Insurance Law § 3420(a)(5)(McKinney 2009). The amendment became effective on January 17, 2009 and only applies to polices issued or delivered after such date. *Id; see also* 2008 N.Y. Sess. Laws ch. 388.

circumstances that will excuse a delay, such as lack of knowledge that an accident occurred or a reasonable belief in non-liability. *White v. City of New York*, 615 N.E.2d 216, 217 (N.Y. 1993). The insured has the burden of demonstrating the reasonableness of the excuse, given all of the circumstances. *Id.; Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 287 (2d Cir. 2003)."However, where a reasonable person could envision liability, that person has a duty to make some inquiry." *White*, 615 N.E. 2d at 217. When such "inquiry leads to the reasonable conclusion that no liability will result or that no claim would be made, the insured may be excused from giving notice." *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 227 (E.D.N.Y. 1996).

The issue of reasonableness is ordinarily a question of fact for trial. *St. James Mech., Inc. v. Royal & Sunalliance*, 845 N.Y.S. 2d 83 (N.Y. App. Div. 2007); *Green Door*, 329 F.3d at 287. However, "'a delay may be unreasonable as a matter of law when either no excuse is advanced or the proffered excuse is meritless.'" *Green Door*, 329 F.3d at 287 (quoting *Olin*, 966 F.2d at 724). A court may determine as a matter of law whether the notice was given within a reasonable time when "(1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay." *New York v. Blank*, 27 F.3d 783, 795 (2d Cir. 1994).

## A. <u>WHEN WAS NOTICE PROVIDED?</u>

The Court will first determine whether there is any factual

dispute as to when the Underwriters received notice of the Morella claim. As discussed above, the Underwriters claim that they did not receive notice until after the March, 2007 amended judgment was issued. The Board contends that it notified Aon and that it is unaware of the communications between Aon and the Underwriters.[17] Aon does not dispute that it notified the Underwriters of the judgment in March, 2007.[18] Nonetheless, Aon contends that at least one of the Underwriters was on notice of Morella's claim as early as May,

---

[17]The Court is not persuaded by the Board's argument that its notice of the Morella claim to Aon in 2002 constituted effective notice to the Underwriters. *See Bd. of Husdon River-Black River Regulating District v. Praetorian Ins. Co.*, 867 N.Y.S. 2d 256 (N.Y. App. Div. 2008)("Notice to an insurance broker does not constitute notice to the liability carrier.")(citing *Sec. Mut. Ins. Co. of N.Y. v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 442 n.3 (N.Y. 1972))).

Moreover, the only evidence that the Board submits in support of its claim that Aon acted as the Underwriters' agent is a document, which the Board purports is a record of the Louisiana Insurance Commissioner. The document lists Aon Risk Services Central, Inc. and Aon Risk Services Southwest, Inc. as appointed agents of St. Paul Fire and Marine Insurance as of May 1, 2009 and identifies Aon International Energy, Inc., Aon Risk Services Northeast, Inc. and Aon Risk Services Southwest, Inc. as appointed agents of American Home Assurance Company as of May 1, 2009. Rec. Doc. No. 49-2. The parties in this matter, however, are Aon Corporation, Aon Risk Services, Inc. of Texas and Aon Risk Services, Inc. of Louisiana.

The Board argues that Aon is presumed to be the Underwriters' agent because the policy identifies New Orleans as the location where the policy was countersigned and Aon, not the Underwriters, has an office in New Orleans. The Board further contends that the absence of a signature by an authorized representative of the Underwriters implies that Aon is an agent for the Underwriters. However, the Board cites no authority for such presumption. Rec. Doc. No. 49. The Court notes that Aon's address was listed at the top of the policy as was the Board's address. The Court is also not convinced that the absence of the Underwriters' address on the policy excused the Board from providing notice to the Underwriters.

Finally, the Court notes that the Board alleges in its third-party complaint that "[f]or approximately the past ten years, [Aon has] acted for the Board in the capacity of an insurance broker, in which capacity Aon has procured various policies of insurance on behalf of the Board..." Rec. Doc. No. 34-4, para V.

[18]Rec. Doc. No. 48.

2003.[19]

Aon asserts that the Morella claim was first included in the general liability loss summary that it submitted in connection with its July 1, 2003 to July 1, 2004 renewal underwriting submission. Aon offers May, 2003 emails submitted to AIG and Insurance Company of North America ("INA") with an attached loss summary identifying Morella's claim.[20] The loss summary states, "Clmt was operating a top loader while working for NOMC which fell into a hole."[21] The summary further notes that "[n]o reserves have been established" for the claim which was reported within the past month and that the "Port's lease with NOMC requires that NOMC maintain their leased property – the Port is an additional insured under NOMC's policy."[22] Aon claims that it continued to include updated information regarding Morella's claim with its renewal applications in 2004 and 2005 and that INA issued policies for its share of coverage for those years.[23] The loss summary sent in 2004 states that $215,000.00 had been reserved and that $12,182.90 in expenses had been paid and the loss summary sent in 2005 indicates that $215,000.00 had been reserved and that

---

[19]Rec. Doc. No. 54, p. 6. Notably, Melissa Kidwell, who acted as Aon's claims consultant for the Board, declared in a sworn affidavit that she did not notify the Underwriters of Morella's claim prior to trial. Rec. Doc. No. 48-2, para. 8.

[20]Rec. Doc. No. 54-6, pp. 1-4, 9-10.

[21]*Id.* at p. 4.

[22]*Id.*

[23]Rec. Doc. No. 54; Rec. Doc. No. 54-8, pp. 7, 9; Rec. Doc. No. 54-10, p. 53.

$18,820.89 in expenses had been paid.[24]

Aon argues that such loss summaries constitute adequate notice in light of the Fifth Circuit's recent decision in *East Texas Medical Center Regional Healthcare System v. Lexington Insurance Co.,* which held that computer-generated spreadsheets, called loss runs, could indeed provide notice to an excess insurer despite the documents' "relatively scant information about multiple [] claims." No. 07-40904, 2009 WL 1982368, at *4 (5th Cir. July 10, 2009). In the *East Texas Medical Center* case, the Fifth Circuit recognized that the loss runs spreadsheet estimated the claim at issue well below the amount at which the excess insurance attached. *Id.* Nonetheless, the Fifth Circuit concluded that the fact that the spreadsheet lacked "relevant particulars" was relevant, but "not conclusive [,] to the result," reserving the notice issue for the fact-finder. *Id.*

This Court was able to locate only one New York decision that directly addressed the notice issue. In *Steadfast Insurance Co. v. Sentinel Real Estate Corp.,* the Appellate Division's First Department rejected the argument that a loss run spreadsheet constituted effective notice due to the hundreds of claims included in the list and the lack of information as to which claims the insured intended to tender to the insurer. 727 N.Y.S. 2d 393, 400 (N.Y. App. Div. 2001). The court explained:

---

[24]Rec. Doc. No. 54-8, pp. 4, 9; Rec. Doc. No. 54-10, p. 59.

> Even if it is assumed that the loss run report contained
> sufficient information about the claim to comply with the
> Policy's notice condition, the fact that the report lists
> hundreds of claims, most of which were not going to reach
> the SIR limit and, therefore, would never become the
> insurer's responsibility, makes the report entirely
> unsuitable to be deemed to satisfy the notice
> condition...The insurer should not be required to go
> through such a time-consuming procedure, rather than
> requiring the insured simply comply with the Policy's
> rather straightforward notice requirement...

*Id.*

The loss summaries that Aon submits do not include hundreds of claims as in the *Steadfast* case. In light of the loss summaries sent to INA in 2003 through 2005 identifying Morella's claim, a factual issue exists regarding when notice was provided to INA. The Second Circuit identified the purposes of notice-of-occurrence provisions as follows:

> They enable insurers to make a timely investigation of
> relevant events and exercise early control over a claim.
> Early control may lead to a settlement before litigation
> and enable insurers to take steps to eliminate the risk
> of similar occurrences in the future. When insurers have
> timely notice of relevant occurrences, they can establish
> more accurate renewal premiums and maintain adequate
> reserves.

*Comm. Union*, 822 F.2d at 271. Whether the loss summaries sent to INA in 2003, 2004, and 2005 satisfied such purposes is for the jury to determine. Therefore, summary judgment is inappropriate with respect to INA's claim.

Notwithstanding, there is no evidence that either St. Paul Fire and Marine Insurance Company ("St. Paul") or AHAC received similar

email notification. Nor has Aon cited any authority that notice to one underwriter constitutes notice to all of the underwriters. Instead, the policy's "Notice Of Occurrence" provision refers to notice to "Underwriters," not at least one underwriter.[25] Given the lack of evidence that St. Paul and AHAC received notice prior to the amended judgment, the Court must determine whether the policy required notice at an earlier date.

**B.** **WHEN DID THE DUTY TO PROVIDE NOTICE ACCRUE?**

The policy's "Notice of Occurrence" clause provides:

> Whenever any Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves an event likely to involve this Policy, notice shall be sent to Underwriters as soon as practicable, provided, however, that the failure to notify Underwriters of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later time, would appear to give rise to claims hereunder, shall not prejudice such claims.[26]

New York courts have evaluated similar provisions. *See e.g.,* *Olin Corp v. Am. Re-Ins. Co.*, 74 Fed. App'x at 107-08; *Am. Home Assurance Co. v. Republic Ins. Co.*, 788 F. Supp. 214, 216 (S.D.N.Y. 1992). In *Olin v. American Re-Insurance*, where the excess policies similarly required notice to the insurer "as soon as practicable" whenever the insured may "may reasonably conclude" that a covered

---

[25]Rec. Doc. No. 34-14, p. 10. The policy defines "underwriters" as "the insurer(s) subscribing to this Policy." *Id.* at p. 7.

Moreover, Aon admits that St. Paul, who had declined to participate in the July 1, 2002 to July 1, 2003 renewal, was the lead insurer for the 2001/2002 policy in effect at the time of Morella's injury. Rec. Doc. No. 54, p. 3.

[26]Rec. Doc. No. 34-14, p. 10.

occurrence "is *likely* to involve th[e] policy," the Second Circuit stated that the insured was required to provide notice "as soon as practicable" after it "had information from which it could reasonably conclude that an occurrence covered under an excess policy involved injuries or damage which, in the event [the insured] is held liable, would be likely to trigger the policy." 74 Fed. App'x at 108. "[A]s soon as practicable...merely requires that notice be given within a reasonable time under all the circumstances." *Sec. Mut. Ins. Co. v. Acker-Fitzsimons Corp.*, 293 N.E. 2d 76, 79 (N.Y. 1972). "A provision requiring notice when it 'appears likely' that a claim will or 'may' involve a policy does not require a probability-much less a certainty-that the policy at issue will be involved." *Christiania*, 979 F.2d at 276. "All that is required is a 'reasonable possibility' of such happening, based on an objective assessment of the information available. Such a possibility may exist even though there are some factors that tend to suggest the opposite." *Id.* (citing *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 43 (2d Cir. 1991)); *see Olin v. Ins. Co. of N. America*, 743 F. Supp. 1044, 1054 (S.D.N.Y. 1990)(finding that the insured's duty to notify "accrued when the circumstances known [to the insured] would have suggested a reasonable possibility of a claim that would trigger the excess insurer's coverage"), *aff'd*, 929 F.2d 62 (2d Cir. 1991).[27]

---

[27]The Court rejects the argument that the Board's failure to provide notice before the judgment was issued "shall not prejudice" the Board's claim for coverage pursuant to the policy's "savings clause." Rec. Doc. No. 49, p.

The Underwriters contend that, pursuant to the policy's notice of occurrence provision, the Board should have notified the Underwriters following the Board's counsel's December 15, 2006, "pre-trial report," which advised that "Plaintiff's wage projection expert has calculated a loss of economic capacity for the Plaintiff to be $1,818,861.00" and that "the Plaintiff may have a claim for pain and suffering with a value between $150,000.00 and $300,000.00."[28]

The Board does not dispute that its counsel advised on or about December 15, 2006, that Morella had produced an expert report concluding that he had potential damages of $1.8 million and that there was additional exposure for pain and suffering between $150,000.00 and $300,000.00.[29] Instead, the Board argues that in January, 2004, its counsel recommended a reserve of no more than

_____

15. The Board's argument fails to consider the entire provision, particularly the first half of the sentence which states that the insured "shall" provide notice "as soon as practicable" after it "may reasonably conclude that an occurrence...involves an event likely to involve [the] policy." Rec. Doc. No. 34-14, p. 10. In *Olin Corp. v. Insurance Co. Of North America*, the U.S. District Court for the Southern District of New York analyzed a similar provision and held that the insured's "duty to notify each excess insurer accrued when the circumstances known to [the insured] would have suggested a reasonable possibility of a claim that would trigger that excess insurer's coverage." 743 F. Supp. at 1054. The court did not find that a failure to notify after the obligation accrued "shall not prejudice" the insured's claim. As discussed below, the Board should have concluded that the Morella claim would likely involve the Underwriters' policy by December, 2006. Therefore, the Board's failure to provide notice reasonably near that time is not excused by the "savings clause."

[28]Rec. Doc. No. 34-6, p. 2.

[29]Rec. Doc. No. 34-7, p. 6 (Request No. 17); Rec. Doc. No. 49-7, paras. 8, 9.

$300,000.00 for Morella's claim.[30] The Board further argues that as of December 15, 2006, Morella had not made a settlement offer and that the Board's counsel advised the Board to rely upon its defenses to liability.[31]

Considering the fact that the bumbershoot policy attaches once the underlying limit of $1 million is exceeded as well as the statements made by the Board's counsel in the December 15, 2006, letter, such circumstances should have suggested to the Board a "reasonable possibility" that Morella's claim would trigger the Underwriters' excess coverage. The fact that the Board's counsel only recommended a $300,000.00 reserve two years prior to this pre-trial report is not persuasive.[32] Accordingly, the Board, or Aon, should have sent notice of Morella's claim to the Underwriters within a reasonable time after receiving the December 15, 2006, letter. Notice in March, 2007, was untimely as a matter of law.

### C. **DID THE BOARD HAVE A REASONABLE EXCUSE FOR DELAY?**

Both the Board and Aon argue that under New York law, they were excused from providing notice based upon their good faith belief in non-liability. The Board contends that in the December 15, 2006, letter, its counsel advised the Board to rely on its defenses. Aon

---

[30]Rec. Doc. No. 49-3.

[31]*Id.* at para. 8; Rec. Doc. No. 49, pp. 5,15.

[32]In light of the objective standard applied under New York law, an Aon claims consultant's statement that she "did not reasonably believe that the *Morella* claim was likely to involve the coverage provided by the Excess Underwriters" is also not persuasive. Rec. Doc. No. 48-2, para. 6.

argues that the Board's attorney advised that there should be no liability on the part of the Board because Morella and his employer were aware of the property's defect and that the Board's position was "favorable."[33]

As discussed above, the Board and Aon are correct that, under New York law, the reasonableness of an insured's good faith belief in its non-liability is a factual issue. Nonetheless, the parties have not offered admissible summary judgment evidence of a good faith belief in the Board's non-liability. *Ill. Nat'l Ins. Co. v. Banc One Acceptance Corp.*, No. 05-1260, 2008 WL 5423262, at *13 (N.D.N.Y. Dec. 29, 2008)("Courts have rejected the reasonableness argument where an insured offers no evidence that the timing of its notice was the result of a deliberate determination that it was not responsible for the damages.").

In the December 15, 2006, letter, counsel for the Board does not assert a belief in non-liability; counsel explains available defenses. The December 15, 2006, letter states that the accident occurred in an area that the Board was obligated to resurface. The letter explains the theory pursuant to which the Board could be held liable. It suggests how the Board could dispel notions that it was negligent, and it details possible defenses, i.e., that Morella and his employer may be at fault and that Morella's employer may be required to indemnify the Board if the Board is not at fault. The

---

[33]Rec. Doc. No. 48, p. 2.

letter does not conclude that the Board will not or should not

be liable, only that the Board's position is "favorable due to the

[] legal arguments that it will rely upon for its defense." Nor does

the letter dispute the $1.8 million figure projected by plaintiff's

expert. Based upon the advice provided in the December 15, 2006,

letter, a reasonable person in good faith could "envision liability"

exceeding $1 million.

"Indeed 'when the facts of an occurrence are such that an

insured acting in good faith would not reasonably believe that

liability on his [or her] part will result, notice of the occurrence

given by the insured to the insurer is given 'as soon as

practicable' *if given promptly after the insured receives notice*

*that a claim against him [or her] will in fact be made.*'" *Marinello*

*v. Dryden Mut. Ins. Co.*, 655 N.Y.S. 2d 156, 158 (N.Y. App. Div.

1997)(emphasis in original)(quoting *Merchants Mut. Ins. Co. v.*

*Hoffman*, 56 N.Y. 2d 799, 801)(N.Y. 1982)); *see also SSBS Realty*

*Corp. v. Pub. Serv. Mut. Ins. Co.*, 677 N.Y.S. 2d 136, 137-38 (N.Y.

App. Div. 1998)("At issue is not whether the insured believes he

will ultimately be found liable for the injury, but whether he has

a reasonable basis for a belief that no claim will be asserted

against him.").[34]

---

[34]The Court recognizes that the Second Circuit treats the notice-of-occurrence requirement differently from the notice-of-claim requirement, holding that a notice-of-occurrence provision "focuses on the insured's knowledge of events and reasonable conclusions based on that knowledge" whereas a notice-of-claim provision "focuses on the actions of third parties" and may be triggered by "an assertion of possible liability, no matter how baseless." *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 439 (2d Cir. 1995). The

The Board's delay in providing notice of the Morella claim to St. Paul and AHAC was without a valid excuse and, therefore, unreasonable. The Board's delay in providing notice to St. Paul and AHAC precludes coverage from those subscribers to the policy.

### CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion for summary judgment with respect to St. Paul's and AHAC's claim for a declaratory judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment is **DENIED** with respect to INA's claim for declaratory judgment.

New Orleans, Louisiana, August ____10th____, 2009.

_____
LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE

---

Second Circuit described the rationale for treating the provisions differently as follows: "if insureds were required to notify insurers of every incident that poses even a remote possibility of liability, insurers would soon be swamped with notice of minor incidents that pose little danger [of liability]." *Id.* (quoting *Blank*, 27 F.3d at 795.). "Once there is a reasonable possibility that the policy will be involved, however, this rationale is no longer applicable." *Blank*, 27 F.3d at 796. The possibility of liability in this case was not remote, given the pending lawsuit and plaintiff's expert report projecting damages to exceed $1 million.